FILED IN MY OFFICE
DISTRICT COURT CLERK
6/9/2016 10:19:56 AM
WELDON J. NEFF
Frances Slavey

**STATE OF NEW MEXICO**
**COUNTY OF SAN JUAN**
**ELEVENTH JUDICIAL DISTRICT COURT**

**S.M.,**

   **Plaintiff,**

**v.**         **No.** D-1116-CV-2016-00723

**BLOOMFIELD SCHOOL DISTRICT, a municipal**
**corporation, BENJAMIN GRIFFITH, in his**
**individual capacity, PRINCIPAL CHAD BURKHOLDER,**
**in his official capacity, former PRINCIPAL CODY DIEHL,**
**in his official capacity, SUPERINTENDENT JOE RASOR,**
**in his official capacity,**

   **Defendants.**

## COMPLAINT FOR PERSONAL INJURY AND VIOLATIONS OF CIVIL RIGHTS

## INTRODUCTION

  Teachers shape minds. Our public schools develop our future leaders. The lessons and experiences of a school child permeates throughout the rest of their life and is carried on through generations. It is the job of an educator to ensure that those lessons and experiences create a foundation for success and foster leadership for the next generation. It goes without saying that, because of a teacher's unique position molding minds, a level of trust and respect is required not only between the parent and the teacher, but the student and teacher, as well.  A student-teacher relationship is the first relationship that a child has with an elder, other than the parent, and establishes the manner in which a child interacts, trusts, and treats people for their entire lives. It seems that, due to the importance of this position, educators would safeguard the protection of that trust and that school administrations would employ the best examples for these young, impressionable minds.

Exhibit G

Unfortunately, the importance of both the educator's position and the administration's position to protect this trust was betrayed by the Bloomfield public schools; by Principals Cody Diehl and Chad Burkholder; and, finally, by Benjamin Griffith, a man empowered by school administrators to not only batter, but to sexually objectify and sexually abuse female students in the Bloomfield public schools while surfing pornographic sites with school property.

Plaintiff S.M., by and through her counsel, Kennedy, Kennedy & Ives, brings this Complaint for violations of S.M.'s rights to due process and equal protection under the United States Constitution, right to equal educational opportunity pursuant to Title IX, and for violations pursuant to New Mexico's Tort Claims Act. Plaintiff's allegations follow.

## JURISDICTION AND VENUE

1. Jurisdiction and venue are proper in state district court pursuant to NMSA 1978 §10-16-C4.  All of the parties reside in New Mexico and the acts complained of occurred exclusively within the County of San Juan, City of Bloomfield, and the State of New Mexico.

## PARTIES

2. S.M. is a resident of Bloomfield, New Mexico.  She was a student at Bloomfield High School, which is a Bloomfield public school.

3. Defendant Bloomfield School District (hereinafter "BSD") operates the public education system in Bloomfield, New Mexico.  It is a municipal corporation within the State of New Mexico and, as such, is an entity subject to suit under the Federal Civil Rights Act and 42 U.S.C. § 1983. Plaintiff seeks damages against Defendant Bloomfield School District.

4.    Defendant BSD is a public entity subject to suit under Title IX, 20 U.S.C. §§1681-1688, as it is a federal funding recipient.

5.    Defendant BSD is also a governmental entity, which at all times material, employed Defendant Benjamin Griffith as a teacher at Bloomfield High School, Defendants Burkholder and Diehl as the Principals at Bloomfield High School, and Joe Rasor as the Superintendent.

6.    S.M. contends that at all times material, Defendant Benjamin Griffith was acting within the scope of his duties, and he is sued in his individual capacity.

7.    S.M. contends that at all times material, Defendant Burkholder was acting within the scope of his duties, and he is sued in his official capacity.

8.    S.M. contends that at all times material, Defendant Diehl was acting within the scope of his duties, and he is sued in his official capacity.

9.    S.M. contends that at all times material, Defendant Rasor was acting within the scope of his duties, and he is sued in his official capacity.

## FACTUAL ALLEGATIONS

### *Sexual Exploitation in School*

10.    Child abusers must have access to children and the opportunity to normalize their criminal behavior. See Robert J. Shoop, *Sexual Exploitation in Schools*, 70-71 (1st Ed. 2004).

11.    Child abusers are drawn to professions where they have access to children. Id.

12.    Educators have access to children.

13.    Child sex abuse generally occurs in predictable stages. Id. at 24.

14. One stage in the predictable pattern of abuse in school is the "testing" stage.  During that stage, "the teacher might brush against the student's hair, buttocks or breasts…. Usually these actions are ambiguous enough that if the student becomes alarmed or reports the behavior, the educator can plausibly argue the action was inadvertent." Id.

15. During the grooming stage, where the abuser normalizes inappropriate behavior and prepares the child for sexual exploitation, the educator might begin by showing an unusual interest in the private life of the child. Id.

16. Ultimately, the adult's actions may escalate to child molestation, which by definition includes touching a teenage woman's breasts. Id. at 15.

17. Criminal sexual contact of a minor is a felony crime.

18. The New Mexico criminal code also contemplates criminal sexual contact between school employees and students, criminalizing all intentional touching to the intimate parts of a minor and a school employee.

19. Felony criminal sexual contact also includes the conduct of a teacher intentionally touching a teenage woman's breasts.

20. The potential for the sexual abuse of students by educators is known, and administration and districts must take steps to prevent it.

21. To prevent child sexual exploitation in school, principals must acknowledge that exploitation may exist, pay attention, take all rumors and complaints seriously, and not allow bias to cause judgment errors. Id. at 105.

22. Specifically, the *Sanchez v. Brokop* case shed light on Sexual Misconduct in the Farmington School District.  Following a $3.2 million dollar federal jury verdict against a Farmington Public Schools substitute teacher, Arthur Brokop, Superintendent Janel Ryan

hired Robert Shoop, Plaintiff's liability expert, to conduct a training for principals in the School District how to prevent sexual misconduct. 398 F. Supp. 2d 1177 (D.N.M. 2005).

23. Robert Shoop used his expertise and the skills laid out in his book, cited herein, for the training program conducted by Superintendent Ryan, when she recognized the importance of training educators on Sexual Misconduct in the four corners area of Northern New Mexico.

24. NMSA § 32A-4-3 provides that, "Every person, including … a schoolteacher; a school official … who knows or has a reasonable suspicion that a child is an abused or a neglected child shall report the matter immediately to: (1) a local law enforcement agency; (2) the department; or (3) a tribal law enforcement or social services agency for any Indian child residing in Indian country." NMSA § 32A-4-3.

25. Failure to report suspected abuse is criminally punishable by up to a year in jail.

26. NMSA § 32A-4-3 was enacted to protect children, and specifically children at school, from child abuse in school.

**Notice to School District that Principals Need to be Trained on Sexual Misconduct**

27. Principals should conduct themselves and lead the school in an exemplary fashion.

28. In 2007, Farmington's Superintendent, Janel Ryan, saw the importance of training the principals in Sexual Misconduct.

29. Conducting these trainings ensures the safety of the students and the awareness that such a thing could occur at a school.

30. Principals who complete training on sexual misconduct will more likely be on alert and take any and all allegations seriously. See Robert J. Shoop, _Sexual Exploitation in Schools_, 25 (1st Ed. 2004).

31. The training of principals on sexual misconduct could lead to a trickle-down effect that would not only educate the rest of the school but would leave students to learn in a safer environment, free from fear of sexual exploitation and misconduct, and feeling safe enough to report acts of sexual abuse by school personnel.

**Notice to School District that Griffith was a Foreseeable Danger to Female Students**

*K.M.*

32. In 2005, Defendant Griffith engaged in violent, aggressive, and predatory behavior prior to being hired by BSD.

33. K.M. contacted the authorities in 2005 to inform them of Griffith's violent behavior.

34. On August 9, 2005, K.M. contacted officers to report an incident that occurred between herself and Defendant Griffith.

35. The Las Cruces Police Department completed an Incident Report with Case ID L200516372, readily available through public record.

36. Officer Joan Chavez classified this incident as a CA3 CHILD ABUSE COLD.

37. The report listed the following facts:

38. K.M. was a member of a Christian Group called Young Life, and Defendant Griffith was a Counselor within this program.

39. At the time, K.M. was sixteen years old, a minor.

40. On August 3, 2005, K.M., Defendant Griffith, Stephanie Griffith (Defendant's wife), and another church member, Stephanie Radtke, were all at Starbucks Coffeehouse.

41. Defendant Griffith called K.M. and her friend, Ms. Radtke, lesbians.

42. In the past, Defendant Griffith frequently picked on K.M. and often called her names in front of others.

43.   K.M. became tired of being picked on by Defendant Griffith and soon became upset by this and asked for Defendant Griffith to stop, but he did not.

44.   Defendant Griffith told K.M. that if, "this card said lesbian, she would be a winner."

45.   K.M. was extremely upset and reached across the table and smacked Defendant Griffith on the arm with an open hand.

46.   Defendant Griffith then hit sixteen-year-old K.M. back.

47.   K.M. hit Defendant Griffith again, knocked off his glasses, and believed it was with a backhand punch.

48.   Defendant Griffith called K.M. a "stupid fucking bitch," told her that she broke his glasses, and that he would "shove the glasses up her ass."

49.   A physical altercation broke out and both parties, a grown man and a minor child, threw several punches.

50.   Defendant Griffith punched her one last time, at which point K.M. began to cry due to the force and pain of the last punch.

51.   K.M. grabbed a chair and threw it at Defendant Griffith's feet in an attempt to tell him to stay away from her and that this is enough.

52.   After the fight, Starbucks employees only picked up the chair, police were never called, and K.M. left the coffeehouse with her friend, Ms. Radtke.

53.   K.M. was bruised with redness all down her arms, on her upper bicep area, and on her stomach area.

54.   K.M. told her father when she arrived home and he called Defendant Griffith to hear from him what had occurred between his minor child and the Counselor.

55.   K.M. and her father called the police to report Defendant Griffith's unlawful battery.

56. Detectives took pictures of the injuries on K.M. caused by Defendant Griffith.

57. Detectives called the next counselor in charge, Ms. Lacey Kimpton, of Young Life, the Christian Group.

58. Ms. Kimpton told the Detectives that they would look into it but for the time being, Defendant Griffith was still a counselor.

59. Sometime after the Starbucks incident, K.M. went to visit and stay with Defendant Griffith and his wife, Stephanie, in Farmington, where the Griffith family moved.

60. Stephanie Griffith mentored K.M. and they had a very close relationship.

61. Defendant Griffith and Stephanie did not have any children at the time, so it was just the three of them at the house.

62. K.M. was 16 at the time, still a minor, and slept in a separate bedroom.

63. During the course of her stay at the Griffiths', K.M. was sleeping in the bedroom when Defendant Griffith entered.

64. Defendant Griffith did enter her room sometime after 10:00 p.m. but before midnight.

65. Defendant Griffith entered K.M.'s bed with her in it.

66. Defendant Griffith wore only boxers when he entered 16-year-old K.M.'s bed.

67. K.M. was wearing boxers and a tee shirt.

68. Defendant Griffith used his hands to grab and dig at K.M. and made "goofy" noises.

69. Defendant Griffith's behavior escalated and he placed his hand down K.M.'s boxers.

70. Defendant Griffith attempted to touch K.M.'s vagina.

71. Defendant Griffith developed an erection.

72. K.M. feared that she would be raped and physically fought Defendant Griffith off of her.

73. Defendant Griffith made K.M. feel guilty for his behavior and K.M. feared Stephanie Griffith's reaction if she heard or found out; K.M. remained silent in fear.

74. K.M. attempted several times to get Defendant Griffith to stop, but she did not know how to stop this behavior.

75. K.M. successfully forced Defendant Griffith to stop and he soon left the bedroom.

76. One day Defendant Griffith punched K.M. and then, a few weeks later, he tried to rape K.M.

77. Defendant Griffith does not know when to stop nor does he know how to control himself.

78. Any competent background investigation into whether to hire Defendant Griffith as a teacher would have shown that Defendant Griffith is a foreseeable danger to any teenaged female, both in public and private situations.

79. If BSD had conducted a public records search on all police reports relating to Defendant Griffith, they would have discovered these incidents with K.M. that were documented in police reports.

80. BSD would have known that Defendant Griffith posed a threat to all young, female students.

*"I am not afraid to slap you."*

81. Almost exactly a year prior to Defendant Griffith's sexual assault on S.M., Defendant Griffith battered and threatened a female student.

82. In a letter dated October 18, 2013, Defendant former Principal Cody Diehl (hereinafter "Defendant Diehl") placed Defendant Griffith on paid administrative leave.

83. The letter states that Defendant Griffith violated board policy G-0850 which details staff conduct with students.

84. An investigation was conducted by Defendant Diehl.

85. On October 21, 2013, Defendant Diehl sent Defendant Griffith a letter regarding "Letter of Expectation."

86. The letter outlined the expectations that Defendant Diehl had regarding Defendant Griffith's conduct and behavior with students and staff.

87. Defendant Diehl stated that his investigation, and Defendant Griffith's administrative leave, stemmed from an incident regarding Defendant Griffith and a female student.

88. It was brought to Defendant Diehl's attention that Defendant Griffith grabbed a student by the collar, pushed her back, and said, "I am not afraid to slap you."

89. Through the investigation, Defendant Diehl concluded that he had information that needed to be addressed with Defendant Griffith and listed three expectations he had for him in the future as a result of having "more than one conversation" with Defendant Griffith regarding his behavior and conduct with faculty, staff, and students.

90. Among other expectations, Defendant Griffith was expected to refrain from physical contact with students.

91. Just a year prior to Defendant Griffith's sexual assault on S.M., Defendant Diehl, as the Principal, and Defendant Burkholder, as the Vice-Principal, were on notice that Defendant Griffith was a danger to young, female students.

*E.G.*

92. Just eight months prior to Defendant Griffith's sexual assault on S.M., Defendant Griffith battered a student in class.

93. On February 27, 2014, Defendant Griffith was teaching his second period class.

94. E.G. was a student in Defendant Griffith's class on the aforementioned date.

95.  Defendant Griffith walked towards the back of the classroom to grab a tissue when he noticed E.G. communicating with her friend.

96.  Defendant Griffith chose to use his hands and firmly press down on E.G.'s shoulder to force her to stop communicating.

97.  At no point did Defendant Griffith give a verbal warning prior to putting his hands on a student.

98.  The firm pressing on E.G.'s shoulder by Defendant Griffith was intentional and unwanted.

99.  A letter was sent to Defendant Griffith from Defendant Diehl regarding "Written Reprimand."

100. The letter noted that Defendant Griffith was placed on paid administrative leave to conduct an investigation for the alleged violation of Board Policy G-0850, detailing staff conduct with students.

101. The investigation results determined that Defendant Griffith was in direct violation of the "Letter of Expectations" sent out on October 21, 2013, by Defendant Diehl highlighting that he was to refrain from physical contact with students.

102. It was found that Defendant Griffith's actions with E.G. were deemed inappropriate and violated District Policy G-0850.

103. He was ordered on an "immediate and sustained basis" to refrain from all physical contact with students and adhere to the above policy.

104. Just eight months prior to Defendant Griffith's sexual assault on S.M., Defendant Diehl, as the Principal, and Defendant Burkholder, as the Vice-Principal, were on notice, once again, that Defendant Griffith was a danger to young, female students.

*Recommendation of Non-Renewal*

105. A letter was sent to Defendant Griffith by Defendant Diehl dated May 2, 2014, as a professional courtesy.

106. This letter highlighted Defendant Diehl's recommendation that Defendant's contract not be renewed by the Superintendent, Defendant Rasor, for the 2014-2015 year.

107. Defendant Diehl's recommendation was not an official notice of termination but it was Defendant Diehl's professional opinion.

108. Defendant Diehl implored the Superintendent, Defendant Rasor, to reconsider keeping Defendant Griffith on as staff.

109. Defendant Diehl knew Defendant Griffith was a danger to young, female students, yet, Defendant BSD and Defendant Rasor ignored the recommendation and renewed his contract.

110. Defendant Griffith sexually assaulted S.M. five months after Defendant Diehl's recommendation to terminate Defendant Griffith's contract as a staff member.

111. Defendants ignored that recommendation and S.M. suffered as a result.

### S.M.

### Griffith's Repeated Sexual Contact of S.M. was the Inevitable Result Of BSD's Custom and Practice

112. Upon information and belief, BSD's personnel were either not trained to recognize and report signs of sexual abuse or were deliberately indifferent to those signs.  Given the potential for sexual abuse in schools, this leaves students vulnerable to unlawful sexual advances and violates the constitutional rights of students who have been touched unlawfully.

113. Upon information and belief, BSD does not have a clear policy outlining proper administrative responses to repeated allegations that a teacher has inappropriately touched students.  Additionally, BSD either does not have a tracking system to ensure that a teacher who has been the subject of multiple complaints is not rehired or BSD hires such a teacher despite knowing there have been repeated allegations.  These failures amount to deliberate indifference to the rights of students to be free from sexual abuse, including S.M.'s rights.

114. BSD's failure to train, delineate proper procedure in response to repeated allegations of inappropriate teacher conduct, and/or ensure teachers who have been the subject of multiple complaints at multiple schools constitute a pattern and practice.

115. BSD Policymakers, including Defendant Principal Burkholder, Defendant Diehl, and Defendant Rasor, had actual or constructive notice of this pattern and practice because the proper discharge of policymakers' responsibilities would have uncovered the constitutional violations resulting from BSD's pattern and practice.

116. A Superintendent has enumerated powers and duties pursuant to NMSA 1978 Section 22-5-14.

117. The local superintendent is the chief executive officer of the school district. <u>Id.</u>

118. The local Superintendent must carry out the educational policies and rules of the state board [department] and local school board. <u>Id.</u>

119. The local Superintendent employs, fixes the salaries of, assigns, terminates or discharges all employees of the school district. <u>Id.</u>

120. Defendant Rasor, the local Superintendent, acted as the chief executive officer at all times material and neglected to listen to Defendant Diehl's recommendation that Defendant Griffith be fired five months before S.M. was sexually assaulted and battered.

121. The Public Education Department has a handbook to guide all individuals licensed through the Public Education Department, from teachers to administrative personnel.

122. In this handbook, under Title 6, Chapter 60, Part 9, it discusses the Primary and Secondary Education School Personnel-General Provisions Licensure Requirement, Code of Ethical Responsibility of the Education Profession.

123. Under 6.60.9.8, The Code of Ethics highlights the standards that all individuals licensed under the Department of Education must comply with.

124. Under 6.60.9.8(A)(4), in fulfilling obligations to students, they must constantly seek to improve learning facilities and opportunities.

125. Under 6.60.9.8(C)(1), in Commitment to the Profession, they recognize that a profession must accept responsibility for the conduct of its members and understand that their own conduct may be regarded as representatives of the profession.

126. In 6.60.9.9, The Standards of Professional Conduct highlights the standards that all individuals licensed under the Department of Education must comply with, stating that ethical values in the schools cannot exist without ethical leadership. (Preamble, 6.60.9.9(A)(1)).

127. Under Standard I: Duty to the Student, section 6.60.9.9(B)(7)(a-c) requires any licensed individual with the Public Education Department to not have inappropriate contact with any student, which includes but is not limited to:

    a.   All forms of sexual touching, sexual relations or romantic relations;

b.   Inappropriate touching which is any physical touching, embracing, petting, hand-holding, or kissing that is unwelcome by the student or is otherwise inappropriate given the age, sex and maturity of the student;

c.   Any open displays of affection toward mostly-boys or mostly-girls.

128.   Under section 6.60.9.9(B)(8)(a), any individual licensed with the Public Education Department shall not interfere with a student's right to a public education by sexually harassing a student, prohibited behavior includes:

a.   Making any sexual advances, requests for sexual favors, repeated sexual references, any name calling by means of sexual references or references directed at gender-specific students, any other verbal or physical conduct of a physical nature with a student even where the licensed educator believes the student consents or the student actually initiates the activity, and any display/distribution of sexually oriented materials where students can see them.

129.   Under section 6.60.9.9(C)(9), any individual licensed with the Public Education Department shall avoid conduct connected with official duties that is unfair, improper, illegal or gives the appearance of being improper or illegal.

130.   Under section 6.60.9.9(C)(11), any individual licensed with the Public Education Department shall educate oneself at least annually about avoiding sexual harassment by either attending periodic training, reviewing sexual harassment literature or the Equal Employment Opportunity Commission (EEOC) guidelines found at Title 29 Code of Federal Regulations Part 1604 (29 C.F.R. Section 1604.1 *et seq.*), or contacting appropriate school human resources personnel.

131. Under section 6.60.9.9(C)(22), any individual licensed with the Public Education Department shall not use school information technology equipment, hardware, software or internet access to view, download, display, store or print pornographic images or advertisements, nude images, or sexually explicit depictions or language.

132. Under section 6.60.9.9(C)(23)(a), any individual licensed with the Public Education Department shall not engage in unprofessional conduct, which conduct shall include but is not limited to the following:

   a. Striking, assaulting or restraining a student for no valid reason.

133. Under Failure to Comply with this Code, Section 6.60.9.10 states that both the code of ethics and standards of professional conduct are intended to provide a valuable framework of personal ethics to assist educators and administrators in their interaction with colleagues, students, and parents.

134. Under Reporting Requirement, Section 6.60.9.12, it states that it is the duty of each school superintendent or charter school administrator to provide prompt written notification to the director of the educator ethics bureau after taking final action to discharge or terminate the employment, based in whole or in part on a violation of the standards of professional conduct in this rule, or any certified or licensed school employee, or any other person providing instructional or education-related services in a school under written authority of the PED.

*Griffith's Sexual Battery of S.M.*

135. S.M. was a 17-year-old student at Bloomfield High School.

136. On October 15, 2014, Defendant Griffith admitted to committing the crime of Criminal Sexual Contact of a Minor (4th Degree Felony) against S.M.

137. The incident occurred at Bloomfield High School.

138. On October 17, 2014, the Police arrived at the Bloomfield School Administration building in response to the events that occurred two days prior.

139. On October 15, 2014, during 6th and 7th period, S.M decided to complete English school work in the English computer lab, instructed by Defendant Griffith.

140. S.M. entered the English computer lab, placed her items down, and went to the restroom. Upon her return, Defendant Griffith questioned her about her whereabouts.

141. S.M. pulled up YouTube on the computer; plugged in her girlfriend's cell phone to charge; put her earbuds in her ears; and began listening to Niykee Heaton.  On the YouTube page, Niykee Heaton was depicted on her album cover wearing a bra and panties.

142. Defendant Griffith leaned over S.M., and looked at Niykee Heaton in her bra and panties. Defendant Griffith asked S.M. what she was listening to.  S.M. began to apologize for the image at the same time that Defendant Griffith started to lean closer toward her and stated that it looked like she was looking up "girl porn."

143. Defendant Griffith became sexually aroused by the image of Niykee Heaton in her bra and panties.

144. Defendant Griffith began messing with the keyboard in order to interfere with S.M's work and continued to ask her questions about the music she was listening to.

145. He grabbed one of the earbuds out of S.M.'s ear and placed it in his ear, then Defendant Griffith began to dance.

146. Defendant Griffith pulled the earbud out of his ear and put it and his hand down the front of S.M.'s shirt.

147. S.M. reached for the earbud and put it back in her ears, indicating to Defendant Griffith that she wanted to be left alone to complete her school work.

148. Defendant Griffith ignored S.M.'s requests, and said, "let me see your phone" as he extended his hand to grab for it.

149. S.M. repeated "NO" numerous times, to no avail.

150. Defendant Griffith tried, again, to grab her phone.

151. Defendant Griffith then hit her breast with his hand and then placed his finger down her shirt, pulling her shirt down towards her breasts and brushing against her breasts with his hand.

152. Defendant Griffith left to help another student but then quickly returned to S.M. and approached her by pinching her left side below her ribs with his fingers.

153. S.M.'s reaction of pulling away from him only caused Defendant Griffith to aggressively persist in touching her body and breasts with his hands.

154. Defendant Griffith asked if S.M. was ticklish, to which she told him she was not.

155. Continuously, S.M. told Defendant Griffith to stop while physically trying to stop him from continuing to grope her breasts while asking her if she was ticklish.

156. Defendant Griffith stepped away to assist another student.

157. When he returned to S.M., Defendant Griffith had a large, manila envelope in his hand and placed the corner of the envelope down the front of S.M.'s shirt.

158. She attempted to move the corner of the envelope away from her chest.

159. Defendant Griffith asked S.M. about the color and design of her bra, questioning if it was polka dot, and then asked to see her bra.

160. S.M. said "NO" but Defendant Griffith continued to ask approximately three more times to see her bra.

161. Defendant Griffith moved S.M.'s hand off the keyboard and typed the word, "asshole" on the screen, to protest not being able to see her bra.

162. Defendant Griffith threatened to pinch her on her breast and began to grab and dig at her again.

163. S.M. continued to say "NO" and pleaded with him to leave her alone to do her school work.

164. S.M. knew Defendant Griffith was married with children, a grown man, and a teacher at the school.

165. Defendant Griffith grabbed her again. S.M. stood up, turned to the right side of the chair, because he was standing on the left, and indicated she wanted to leave.

166. At this point, all the other students left the classroom and S.M. was alone with Defendant Griffith.

167. When S.M. stood up, he moved toward her and asked if she was scared.

168. S.M. gathered her things and told Defendant Griffith she was leaving.

169. Defendant Griffith questioned S.M. as to why she needed to leave.  S.M. felt trapped by the position that Defendant Griffith was standing in relation to the proximity of her body to the wall and Defendant Griffith's body facing her.

170. S.M. left the classroom as Defendant Griffith said, "okayyyy" in a drawn out whining voice.

171. S.M. tried to act normal as she went to her locker, until she ran into a friend.

172. She told her friend about what happened. S.M. knew she needed to report it because she no longer felt like she could study at school.

173. Defendant Chad Burkholder was principal of the school at all times material.

174. Defendant BSD and Defendant Burkholder placed Defendant Griffith on administrative leave until they could conduct an investigation.

175. Defendant BSD and Defendant Burkholder told Defendant Griffith not to contact S.M. in any manner.

176. The Administration told an investigating officer that S.M. initially informed a substitute teacher of the sexual battery. Mrs. Kimberly Tanner, in turn, reported the sexual battery to the principal.

177. Defendant Burkholder then told S.M. that she should write an official statement that he would secure.

178. S.M. took several days off of school.

179. Defendant Burkholder kept the original statement by S.M. in the school's vault.

180. On October 23, 2014, Detectives met with Debbie Serrano, the Human Resources Director, at the Bloomfield School's Administrative Office because she told them that she had important information pertaining to the case.

181. Ms. Serrano informed the detectives that upon Defendant Griffith being placed on administrative leave, he handed over his work computer, which was provided to him by the school and was school property.

182. The Information Technology Director, Russ Florez, looked into the files on Defendant Griffith's work computer.

183. Mr. Florez found that, on his work computer, Defendant Griffith accessed pornographic sites, what he called "teen porn."

184. Mr. Florez took screenshots of the pornographic sites and printed the pages out.

185. The following are the titles of the sites that Defendant Griffith accessed with his work computer, provided by Defendants BSD and Burkholder:

    a.  BFFs First Time College Threesome;

    b.  First Time College;

    c.  Teen School Up Skirt;

    d.  Live jasmine.com Hot Live Sex Shows;

    e.  Voyeur Camera School Girls Up Skirt Panties;

    f.  Up Skirt College Ebony;

    g.  Free Live Video Chat-free nude cam-sex shows-adult streaming-free porn;

    h.  Take Off Body Suits for Women;

    i.  Sexy Teen Body Suits for Women;

    j.  Sexy College Activity in Dorm Room;

    k.  Brittany Spears homemade Sex Romp in Mansion;

    l.  Sexy Brittany Spears Pictures;

    m.  Brittany that she did it again wow Brittany Spears sex tape;

    n.  Brittany Spears Hot Pussy.

186. Defendants BSD and Burkholder placed Defendant Griffith's work computer into the custody of Mr. Florez.

187. On October 28, 2014, Detectives spoke to Defendant Griffith's wife, Stephanie Griffith, and she told the police that she knew of the allegations.

188. On Sunday, September 10, 2014, Detectives met with Defendant Griffith's friend, Ned, in regards to information that they had pertaining to the case.

189. Defendant Griffith told his friend, Ned, all about his sexual battery of S.M.

190. Defendant Griffith is a member of the Pastor's church.

191. The Detective recorded Ned's statement.

192. Ned informed the police that he first met Defendant Griffith two years prior at the church and that they worked together with children at the church.

193. Defendant Griffith asked Ned for the Pastor's phone number and then confided in Ned about the incident that occurred with S.M.

194. Defendant Griffith lied to Ned initially, stating that he did not do it, but then several days later, Defendant Griffith visited Ned at his work place and admitted to the allegations.

195. Ned noted that Defendant Griffith explicitly admitted to touching a student's breasts.

196. Both the Pastor and Ned informed the Detectives that Defendant Griffith told them that he fondled a student's breasts in a computer lab but that the police could not get proof because there are no cameras in the computer lab.

197. On April 11, 2016, Defendant Griffith appeared before the District Court in the County of San Juan and pled guilty to Criminal Sexual Contact of a Minor in the Fourth Degree (Case No. D-1116-CR-201401237-8).

## **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**
**Fourteenth Amendment Right to Bodily Integrity
Against Defendant Griffith.
(42 U.S.C. § 1983)**

198. S.M. incorporates by reference the preceding paragraphs as though they were stated fully herein.

199. At the time of Defendant Griffith's sexual assaults, batteries, and harassment of S.M., S.M. enjoyed due process rights under the Fourteenth Amendment to the United States Constitution.  This included the right to be secure in her bodily integrity and free from sexual contact from an English teacher in a computer lab.

200. Defendant Griffith's sexual assaults, batteries, and sexual harassment of S.M. violated her Fourteenth Amendment right to be secure in her bodily integrity and free from sexual contact by the English teacher.

201. Defendant Griffith's acts were intentional, wanton, malicious, sadistic, and in gross and reckless disregard of, or deliberate indifference to, S.M.'s constitutional rights.

202. Defendant Griffith acted with the purpose of causing harm to and victimizing S.M. and not to accomplish any legitimate goal.

## SECOND CAUSE OF ACTION
### Violation of S.M.'s right to equal protection of the law against Defendant Griffith.
### (42 U.S.C. § 1983)

203. S.M. incorporates by reference the preceding paragraphs as though they were stated fully herein.

204. At all times relevant to this Complaint, S.M. enjoyed the right to equal protection of the law under the Fourteenth Amendment.

205. Defendant Griffith's male students were similarly situated to S.M.

206. Defendant Griffith sexually assaulted, battered, and harassed S.M., a female student, a member of a protected class, female.

207. Defendant Griffith did not, however, sexually assault, batter, or harass male students, as he did S.M.

208. Defendant Griffith sexually assaulted, battered, and harassed S.M. because she is female and for his own sexual gratification.  In doing so, Defendant Griffith violated S.M.'s Fourteenth Amendment right to equal protection of the law.

209. Defendant Griffith's acts were intentional, wanton, malicious, sadistic, and in gross and reckless disregard of, or deliberate indifference to, S.M.'s constitutional rights.

210. Defendant Griffith acted with the purpose of causing harm to and victimizing S.M., and not to accomplish any legitimate goal.

### THIRD CAUSE OF ACTION
**Battery against S.M.**

211. S.M. incorporates by reference the preceding paragraphs as though they were stated fully herein.

212. In undertaking the unwanted sexual contact of S.M. as described above, Defendant Griffith intended to cause a harmful and offensive contact with S.M.

213. In undertaking the unwanted sexual contact of S.M. as described above, Defendant Griffith caused an offensive contact with S.M. to occur.

214. S.M. suffered injuries as a result of Defendant Griffith's actions.

215. Defendant Griffith's actions, as described in the preceding paragraphs, constitute battery under New Mexico law.

### FOURTH CAUSE OF ACTION
**Violation of the Due Process Right to Bodily Integrity Guaranteed by the Fourteenth Amendment of the United States Constitution against Defendant BSD, Defendant Burkholder, Defendant Diehl, and Defendant Rasor.**
**(42 U.S.C. § 1983)**

216. S.M. incorporates by reference the preceding paragraphs as though they were stated fully herein.

217. As the principal and vice-principal at BSD schools, Defendant Burkholder, in his official capacity, was a BSD policy maker.

218. As the former principal at BSD schools, Defendant Diehl, in his official capacity, was a BSD policy maker.

219. As the Superintendent for BSD schools, Defendant Rasor, in his official capacity, was a BSD policy maker.

220. At the time of Defendant Griffith's sexual harassment, assaults, and batteries of S.M., S.M. enjoyed due process rights under the Fourteenth Amendment to the United States Constitution. This included the right to be secure in her bodily integrity and free from sexual contact from an English teacher.

221. Griffith's sexual assaults, batteries, and harassment of S.M. violated her Fourteenth Amendment right to be secure in her bodily integrity and free from sexual contact by an English teacher.

222. Defendant BSD, Defendant Burkholder, Defendant Diehl, and Defendant Rasor's failure to adequately train, delineate proper procedure in response to repeated allegations of inappropriate teacher conduct, and/or ensure teachers who have been the subject of multiple complaints at multiple schools are not permitted to continue to teach children constitute a pattern and practice. That pattern and practice was a moving force in the deprivation of S.M.'s right to be secure in her bodily integrity and free from a sexual battery by an English teacher.

223. By allowing Defendant Griffith continued access to students, despite previously concerning reports about Griffith's conduct with students and young females, in addition to failing to protect S.M. from Defendant Griffith, whose sexual misconduct was known

or should have been known to Defendant Burkholder, Defendant Diehl, and Defendant Rasor, was grossly negligent. Defendant Burkholder, Defendant Diehl, and Defendant Rasor violated S.M.'s Fourteenth Amendment right to bodily integrity.

224. Defendants' acts did not further a government interest.

## FIFTH CAUSE OF ACTION
### Violation of S.M.'s Right to Equal Protection under the Law against Defendant BSD, Defendant Burkholder, Defendant Diehl, and Defendant Rasor.
### (42 U.S.C. § 1983)

225. S.M. incorporates by reference the preceding paragraphs as though they were stated fully herein.

226. As the principal and vice-principal at BSD schools, Defendant Burkholder, in his official capacity, was a BSD policy maker.

227. As the former principal at BSD schools, Defendant Diehl, in his official capacity, was a BSD policy maker.

228. As the Superintendent for BSD schools, Defendant Rasor, in his official capacity, was a BSD policy maker.

229. At all times relevant to this Complaint, S.M. enjoyed the right to equal protection of the law under the Fourteenth Amendment.

230. BSD and BSD High School male students were similarly situated to S.M.

231. All of the known previous complaints against Griffith involved female students, not male.

232. Defendant Griffith sexually assaulted, battered, and harassed S.M.

233. Defendant BSD, Defendant Burkholder, Defendant Diehl, and Defendant Rasor's failure to adequately train, delineate proper procedure in response to repeated allegations of inappropriate teacher conduct, and/or ensure teachers who have been the subject of

multiple complaints at multiple schools and not permitted to continue teaching children constitute a pattern and practice. That pattern and practice was a moving force behind the deprivation of S.M.'s right to equal protection under the law.

234. By allowing Defendant Griffith continued access to students, despite previously concerning reports about Griffith's conduct with students, and failing to protect S.M. from Defendant Griffith, whose sexual misconduct was known or should have been known to Defendant Burkholder, Defendant Diehl, and Defendant Rasor, Defendants violated S.M.'s right to equal protection under the law.

235. Defendants' acts did not further a government interest.

236. Defendants BSD, Defendant Burkholder, Defendant Diehl, and Defendant Rasors' acts were intentional, wanton, malicious, sadistic, and in gross and reckless disregard of, or deliberate indifference to S.M.'s constitutional rights.

## SIXTH CAUSE OF ACTION
### Negligent Maintenance of a Building
against Defendant BSD, Defendant Burkholder,
Defendant Diehl, and Defendant Rasor.
(NMSA 1978, 41-4-1, et seq.)

237. S.M. incorporates by reference the preceding paragraphs as though they were stated fully herein.

238. While a teacher at Bloomfield High School, Griffith, a public employee, was acting within the course and scope of his duties on behalf of BSD.

239. Defendant Burkholder, Defendant Diehl, and Defendant Rasor all had a duty to maintain safety of those areas of Bloomfield High School reserved for common use by students and teachers.

240. Defendant Burkholder, Defendant Diehl, and Defendant Rasor negligently operated and maintained the school grounds and its building by providing Defendant Griffith access to young, female students like S.M., K.M., E.G., and the female student who was battered by Defendant Griffith and told that, "I am not afraid to slap you."

241. By allowing Defendant Griffith, a teacher Defendant Burkholder, Defendant Diehl, and Defendant Rasor knew or should have known to have had multiple, serious complaints against him and Defendant Burkholder, Defendant Diehl, and Defendant Rasor failed to exercise due care in maintaining a building that was secure for students generally and female student specifically.

242. By allowing Defendant Griffith, a teacher, to batter multiple female students, Defendant Burkholder, Defendant Diehl, and Defendant Rasor knew or should have known Defendant Griffith to have had multiple serious complaints against him, to utilize school property as a means to access "teen" porn and sexually harass students, Defendant Burkholder, Defendant Diehl, and Defendant Rasor failed to exercise due care in maintaining a building that was secure for students generally and female students specifically.

243. By failing to adequately train teachers and administrators to recognize and report improper contact between students and teachers, delineate proper procedure in response to repeated allegations of inappropriate teacher conduct, and/or ensure teachers who have been the subject of multiple complaints at multiple organizations/institutions are not rehired or retained, Defendant Burkholder, Defendant Diehl, and Defendant Rasor did not exercise due care in maintaining a building that was safe and secure for students generally and female students specifically.

244. Defendant Griffith, the subject of many previous complaints, constituted an unreasonable condition of dangerousness to all students at Bloomfield High School, especially those female students who studied in the English computer lab, or who came in contact with Defendant Griffith after he had become sexually aroused by viewing "teen porn," on his work computer while in school.

245. Defendant Burkholder, Defendant Diehl, and Defendant Rasor, exercising reasonable care, knew or should have known that allowing Defendant Griffith to continue to teach and view pornography on a school work computer at Bloomfield High School constituted a dangerous condition on the school grounds.

246. Defendant Burkholder, Defendant Diehl, and Defendant Rasor failed to correct the dangerous condition – Defendant Griffith – by allowing him unsupervised access to students despite repeated complaints related to his conduct with students, including, but not limited to, battery, touching them inappropriately, and making them feel uncomfortable; and by allowing him unfettered access to pornography on his work computer resulting in his sexual arousal and sexual assault and battery of S.M.

247. As a direct and proximate result of Defendant Burkholder, Defendant Diehl, and Defendant Rasors' creation of a general condition of unreasonable risk and Defendant Griffith's foreseeable sexual contact with S.M., S.M. suffered, and will continue to suffer, extreme emotional distress.

**SEVENTH CAUSE OF ACTION**
**Sex Discrimination**
**against Defendant BSD**
**(Title IX)**

248. S.M. incorporates by reference the preceding paragraphs as though they were stated fully herein.

249. Defendant BSD is a federal funding recipient.

250. S.M. is female.

251. Defendant Griffith sexually harassed and assaulted S.M. because she is female.

252. The sexual assaults of S.M. by Defendant Griffith are sex discrimination.

253. Defendant BSD was on notice, knew, or should have known that Defendant Griffith discriminated against his female students.

254. Defendant BSD responded to complaints from female students with deliberate indifference.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff S.M. respectfully requests that the Court enter judgment in her favor, including:

1. Awarding damages in an amount a jury deems sufficient to compensate S.M. for Defendants' unlawful conduct;

2. Damages for the nature, extent, and duration of S.M.'s injuries;

3. Punitive damages in an amount a jury deems sufficient to deter Defendants and other school districts and educational professional from acting in gross and reckless disregard of, or indifference to, the rights and safety of S.M. and others;

4. Awarding reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988, Title IX;

5. For an award of pre- and post-judgment interest; and

6. For such other and further relief as the Court deems just.

## JURY DEMAND

Plaintiff respectfully demands a jury on all issues so triable.

Respectfully Submitted:

**KENNEDY, KENNEDY & IVES**

**_/s/ Shannon L. Kennedy_**
Shannon L. Kennedy
*Attorney for Plaintiff*
1000 2nd Street NW
Albuquerque, NM 87102
(505) 244-1400   Fax (505) 244-1406